No. 25-11270

In the United States Court of Appeals for the Eleventh

Circuit

STARPRO, GREENS, INC.  et al

*Plaintiff - Appellant,*

v.

POLYLOOM CORPORATION OF AMERICA, et al

*Defendants - Appellees.*

On Appeal from the United States District Court
for the Northern District of Georgia
No. 4:23-cv-00282-WMR
Hon. William Ray, II

# APPELLANT'S BRIEF

Gerald R. Boss
Boss Law Group, LLC
Georgia Bar No.: 068775
5531 Woodsong Trail
Dunwoody, Ga
Phone: (404) 213-4024
gtbsgajd@gmail.com

*Attorney for Plaintiff - Appellant*
STARPRO, GREENS, INC. et al

**U.S. COURT OF APPEALS FOR THE ELEVENTH CIRCUIT**

**CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT (CIP)**

Starpro, Greens, Inc.        *vs.*    Polyloom Corporation of America, et al

Appeal No.        25-11270

11th Cir. R. 26.1-1(a) (enclosed) requires the appellant or petitioner to file a Certificate of Interested Persons and Corporate Disclosure Statement (CIP) with this court within 14  days after the date the case or appeal is docketed in this court, and to include a CIP within every motion, petition, brief, answer, response, and reply filed.  Also, all appellees, intervenors, respondents, and all other parties to the case or appeal must file a CIP within 28 days after the date the case or appeal is docketed in this court. **You may use this form to fulfill these requirements.**  In alphabetical order, with one name per line, please list all trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this case or appeal, including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party.

*(please type or print legibly)*:

District Judge William Ray II

Attorney for Appellant – Gerald Boss

Attorney for Appellee – Devin Dolive

Attorney for Appellee –Graham Stieglitz

Challenger Turf, Inc.

Polyloom Corporation of America

Starpro, Greens, Inc.

Daniel E Selton

Statement.Regarding.Oral.Argument

---

Appellant StarPro, Greens, Inc. et al respectfully submits that an oral argument is not required in view of the briefs and the record.

Dated: July 9 2025                            By: /s/ Gerald R Boss

# TABLE.OF.CONTENTS

Page

STATEMENT REGARDING ORAL ARGUMENT ...............................................i

TABLE OF CONTENTS ...........................................................................ii

TABLE OF CITATIONS ..........................................................................iv

APPELLANT'S BRIEF ........................................................................... 1

STATEMENT REGARDING SUBJECT-MATTER AND
APPELLATE JURISDICTION ................................................................ 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ...................... 2

I. STATEMENT OF THE CASE ...................................................... 3

A. Factual Background.......................................................... 3

1. Nature of the Case ………………................................................. 3

2. Master Putting Turf Prior to Partnership………........................................... 4

3. Polyloom Corporation of America and Challenger Turf, Inc.
approach StarPro, Greens, Inc. to develop a Partnership
regarding MPT………………………………………………… 6

4. Polyloom Corporation of America and Challenger Turf, Inc.
breached their warranty in the sale of Putting Turf to StarPro
in 2023...…………………………………………………………11

5. Polyloom Corporation of America and Challenger Turf, Inc.
violated the US Antitrust laws by refusing to deal with
StarPro after having acquired a monopoly
in MPT manufacturing…………………………………………...12

5A. Product Market………………………………………………….14

5B. Geographic Market ………………………………………………15

B. Procedural History………………………………………………...15

1. The District Court's Order to Dismiss all Pending Claims……15

II. Summary of the Argument………………………………………16

III.    Standard of Review……………………………………………17

A.    Standard Applicable to Motions to Dismiss…………………………….18

IV.    Argument …………………………………………………..18

A. The District Court Erred in Rejecting Detailed Allegations
of a Breach in Partnership duties pursuant to Claim 5……………....18

B. The District Court Erred in Rejecting Well-Pleaded
Allegations Supporting Appellants Breach of Contract Claim………19

C. The District Court Erred in Rejecting Appellant's
Well-Pleaded Allegations Supporting Appellants Antitrust
Violation claims 1 and 2 with respect to Refusal to
Deal Scenario…………………………………………………...21

V.    CONCLUSION....................................................................27

CERTIFICATE OF COMPLIANCE ........................................................ 28

CERTIFICATE OF SERVICE ........................................................... 29

Table.of.Citations

Page

**Cases:**

*Aspen Skiing v. Aspen Highlands Skiing Corp.*

   472 U.S. 585 (1985) ........................................................................ 21, 22, 23

*Baker v. Schneider*

   300 Ga. App. 750 (2009) …………………………………………………18

*Brown Shoe Co. v. U.S.*

   370 U.S. 294 (1962) ................................................................................ 24

*Chaparro v. Carnival Corp.*

   693 F.3d 1333 (11th Cir. 2012) ..................................................... 17

*Columbia Metal Culvert Company v. Kaiser Aluminum and Chemical Corp.*

   579 F.2d 20 (3rd Cir. 1978) ………………………………………………….24

*Eastern Dental Corp. V. Issac Masel Co., Inc.*

   502 F.Supp. 1354 (EDPA 1980) …………………………………………….24,25

*Greyhound Computer Corporation, Inc. v IBM, Corp.*

   559 F.2d 288 (9th Cir. 1977) ………………………………………………...25


*In  La Grasta v. First Union Sec., Inc.*

   358 F.3d 840 (11th Cir. 2004) ......................................................................17

iv

*Spanish Broadcasting System v Clear Channel Communication, Inc.*

   376 F.3d 1065 (11th Cir. 2004)  ....................................................18, 26


*Spectrum Sports, Inc. v. McQuillan*

   506 U.S. 447 (1993) ……………………………………………………23

**Court Rules:**

Fed. R. Civ. P. 12 ........................................................................................ 17

**Statutes:**

28 U.S.C. § 1291……………………………………………………………1

15 U.S.C. § 2………………………………………………………………1

28 U.S.C. § 1331……………………………………………………………..1

28 U.S.C. § 1332 …………………………………………………………….1

28 U.S.C. § 1367……………………………………………………………..1

**Appellant's Brief**

---

## STATEMENT REGARDING SUBJECT-MATTER AND APPELLATE JURISDICTION

This Court has appellate jurisdiction over this appeal pursuant to 28 U.S.C. §1291, as it arises from a final judgment of the United States District Court for the Northern District of Georgia within the Eleventh Circuit, concerning claims brought under Section 2 of the Sherman Act, 15 U.S.C. § 2.  The Final Oder was filed March 10, 2025 (ECF 24) and the Notice of Appeal timely filed on April 8, 2024 (ECF 27).  This court has direct federal question jurisdiction pursuant to 28 U.S.C §1331, diversity jurisdiction pursuant to 28 U.S.C. §1332 and pendant and supplemental jurisdiction over all related claims pursuant to 28 U.S.C. §1367.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.  Whether, in dismissing StarPro, Greens, Inc. ("StarPro") Amended Complaint (ECF No. 13) ("SAC"), the District Court committed reversible error by failing to credit StarPro's well-pleaded factual allegations supporting the existence of the violation of antitrust laws involving "refusal to deal" scenario between Appellant StarPro and Appellee Polyloom Corporation of America and Challenger Turf, Inc. and dismissing Claims 1 and 2 of the SAC as a matter of law.

2.  Whether, in dismissing StarPro's  Amended Complaint ("SAC"), the District Court committed reversible error by failing to credit Starpro's well-pleaded factual allegations regarding the relevant markets supporting the existence of the violation of antitrust laws involving a "refusal to deal" scenario between Appellant Starpro and Appellee Polyloom Corporation of America and Challenger Turf, Inc. and dismissing Claims 1 and 2 of the SAC as a matter of law.

3. Whether, in dismissing StarPro's Amended Complaint, the District Court committed reversible error by dismissing Claim 5 regarding the violation of partnership duties because no written partnership agreement existed and the subject matter of the partnership involved goods which are subject to Georgia's Uniform Commercial Code.

4. Whether, in dismissing StarPro's Amended Complaint, the District Court committed reversible error by dismissing Claim 9 regarding the breach of warranties because Plaintiff had accepted the nonconforming goods even though the defect in the product was not evident at the time the goods were accepted by StarPro.

2

## I.   STATEMENT OF THE CASE

### A.   Factual Background

The following summarizes the most significant facts alleged in the StarPro's Amended ("SAC").

### 1.                    Nature of the Case

This action arises from Defendants repeated, willful, and egregious attempts to run Plaintiff  StarPro out of business which efforts have proven to be successful.  In 2021, Defendants at their inviting and request enticed and lured StarPro into a business Partnership promising to develop and manufacture StarPro' s one of a kind putting turf for StarPro which StarPro had previously been known for in the industry and which Defendants needed StarPro' s good will, industry knowledge and reputation to gain placement into  this more exclusive putting turf market.  In addition to this one of a kind putting turf, Defendants acknowledged they would also provide ancillary synthetic turf products such as related putting border turf and lawn turf.   StarPro trusted Defendants based upon prior relationships and relied upon the assertions and statements made by Defendants enticing StarPro to join Defendants in a Partnership.  Once StarPro became reliant to Defendants for the production of this one of a kind putting turf and related materials,  Defendants  kept the product for itself and ceased dealing with StarPro in 2022, leaving StarPro without the

3

agreed upon one of a kind putting green to sell, effectively injuring StarPro's good will and business.  (SAC ¶ 1)

Even after damaging StarPro's goodwill and business upon ceasing to continue business with StarPro in 2022, Defendants in 2023 approached StarPro again to inquire if StarPro was interested in becoming a customer for the one of a kind putting green at a heavily inflated price.  Due to Defendants having a monopoly in the production of this one of a kind putting turf, StarPro had no alternative but to accept the higher price and purchase the product.  Deviously, Defendants reneged on delivering the agreed upon one of a kind putting turf and substituted an inferior product which resulted in multiple complaints, returns and all putting turf and putting green sales had to cease, thus putting the final nail in the coffin of StarPro.  (SAC ¶ 2).

### 2.    Master Putting Turf Prior to the Partnership

Mr. Selton ( StarPro owner) worked with a group of individuals at a Company to develop a putting surface which it has deemed best in the world – the Master Putting Turf (hereinafter "MPT putting turf").    Through a combined effort the MPT putting turf was created.  (SAC ¶ 21).

A key attribute of the MPT putting turf is that the synthetic fibers are cross-over stitched into the backing and subsequently coated.  The cross-over stitched profile creates a unique putting surface which is omnidirectional meaning that the

4

fibers do not have a grain and that the stimp speed (stimp speed is determined by applying a known velocity to a golf ball and measuring the distance traveled in feet) of the surface is  similar in any direction approaching a Golf Ball Receiver.  Other technologies create a putting surface which has a grain wherein the stimp speed of the putting surface has a certain value in one direction, such as east to west, and another stimp speed of a significantly different value north to south.  The MPT putting turf  is uniform creating a unique putting surface.   Additionally, the MPT putting turf has an embossed rubber backing which provides additional benefits to the do-it-yourself installer.  If the MPT putting turf is intended for indoor usage, the embossed rubber backing provides a frictional surface to maintain the MPT putting turf in contact with flooring.  If the MPT putting turf is intended for outdoor usage, the MPT putting turf's embossed rubber backing is best suitable for do-it-yourself installers as the embossed backing  can accommodate imperfections in the prepared ground surface. (SAC ¶22).  At the time the MPT putting turf was developed at this Company with a Mr. David Calhoun it was the only manufacturing source of cross-over stitched putting surfaces. (SAC ¶23).

StarPro sold their MPT putting turf for installation by do-it-yourself home installers.  In addition to the selling of MPT putting turf, ancillary items were customarily packaged such as cups, flags, synthetic turf borders and synthetic turf. Through the unique MPT putting turf experience for the do it yourself home installer that combines the ability to pair the MPT putting turf with additional synthetic

products such as putting turf and borders with inground cups or the unique Golf Ball

Receiver, StarPro established an exceptional reputation.  The name StarPro has

obtained significant goodwill by the do-it-yourself home installer industry.  Also,

with the customer relations which StarPro developed, Mr. Selton became an expert in

the do-it-yourself market identifying customer demands and what features were the

most important and successful in the marketplace.  (SAC ¶¶ 24, 25).

In 2020, the Company which manufactured the MPT putting turf for StarPro

determined to cease providing the MPT putting turf to StarPro for their home

installers and do it yourself individuals. (SAC ¶ 26 ).

**3.    Polyloom Corporation of America and Challenger Turf, Inc. approach StarPro, Greens, Inc. to develop a Partnership regarding MPT.**

In 2020, with the termination by the Company to sell MPT putting turf to

StarPro, StarPro looked to alternative companies to partner with the development of

the MPT putting turf.  In 2020, David Calhoun who previously worked with Mr.

Selton in the development and manufacturing of the MPT putting turf at the

Company was now employed at Defendant, Challenger Turf as VP of Sales and

Manufacturing (hereinafter "Challenger Turf's VP of Sales & Manufacturing").

Challenger Turf's VP of Sales & Manufacturing was aware of the significant

goodwill which StarPro had established in the do -it-yourself putting turf installation

6

community and StarPro's established reputation and success that was built by selling the best putting turf in the industry, the MPT putting turf.  (SAC ¶¶ 28,29).

Challenger Turf's VP of Sales & Manufacturing had an agreement in place with the Company wherein he could not solicit customers of the Company.  This Agreement terminated in early 2020.  Upon information and belief,  Challenger Turf's  VP of Sales & Manufacturing was aware that Defendant, Challenger Turf sold putting turf which was inferior to the MPT putting turf and that Defendant, Challenger Turf was not successful in the do-it-yourself putting turf marketplace. Upon information and belief, Challenger Turf's VP Sales & Manufacturing approached TenCate North America management to discuss extending an invitation to Mr. Selton  to utilize Mr. Selton as a consultant into the do-it-yourself putting green turf sales and installer market and to utilize StarPro's reputation in the do-it-yourself installer industry to expand their Defendant, Challenger Turf putting turf market and associated peripheral turf products.  (SAC ¶¶ 30, 31).

Upon the termination of his non solicitation agreement in 2020, Challenger Turf's VP of Sales & Manufacturing  with the approval of TenCate North America approached Mr.  Selton to inquire if StarPro would be interested in teaming up with Challenger Turf and TenCate North America to assist TenCate North America in reaching out to trade markets through the StarPro organization.   A meeting was conducted at the Challenger Turf facilities around August 2020.   In attendance at

7

this meeting was David Calhoun in the role of Challenger Turf's VP of Sales & Manufacturing  acting on behalf of Challenger Turf, Daniel E. Selton for StarPro and Mr. Joe Fields representing TenCate North America. At  this meeting, it was discussed how the entities would work together so that Challenger Turf could expand into the do-it-yourself putting turf installers marketplace utilizing StarPro.  The Parties would work together as a Partnership with each entity providing different services relating to the sales of MPT putting turf to the do-it-yourself market. Challenger Turf with StarPro and Mr. Selton would develop  and manufacture exclusively for sale by StarPro the MPT putting turf. TenCate North America would provide warehousing, cutting services and shipment of the MPT putting turf, and associated turf products and StarPro would provide sales and marketing with consulting efforts in developing the MPT. (SAC ¶¶ 32, 33).

Challenger Turf and TenCate North America knew at the time of this meeting that no synthetic turf manufacturers made MPT putting turf for the do-it- yourself putting turf individuals and/or installers or was accessible for purchase by StarPro. Thus, Challenger Turf and TenCate North America knew they would be creating a monopoly in being the sole manufacturer and supplier of MPT to StarPro and the do-it-yourself installer marketplace regarding MPT putting turf.  Challenger Turf and TenCate North America knew at the time of this meeting that the creation of the MPT putting turf product is not easily done and would not be done quickly due to the complexity of the manufacturing of the MPT putting turf.  Once the Partnership

was created, in August of 2020, the MPT putting turf was not ready for sale until August 2021. Even with Challenger Turf's VP of Sales and Manufacturing's prior knowledge in manufacturing the MPT, a yearlong development effort was necessary to complete the MPT putting turf manufacturing process. (SAC ¶¶ 34, 35)

The Parties shared in the profits of this Partnership. Challenger Turf at the direction of StarPro would engage in a run of the MPT putting turf for sale by StarPro. No costs were incurred by StarPro in this endeavor until a sale by StarPro was made. In this relationship, the entities shared in the profits of this common business enterprise. Challenger Turf would manufacture the product at StarPro's direction, TenCate North America North America would warehouse the MPT putting turf and cut the product when required and StarPro would act as the sales agent of the Partnership and solicit sales. When a sale was incurred, StarPro would generate a Purchase Order as an accounting transaction to Challenger Turf and remit payment for the Purchase Order. Only when a sale was made by StarPro would profits be simultaneously realized by all the entities. (SAC ¶¶ 40).

A partnership is an association of two or more persons to carry on as co-owners a business for profit and includes, for all purposes of the laws of this state, a limited liability partnership. O.C.G.A. 14-8-6. StarPro, TenCate North America and Challenger Turf formed a partnership regarding the creation of MPT putting turf for the do-it-yourself Installer market. StarPro provided the market incentive for

9

TenCate North America and Challenger Turf and TenCate North America to work with StarPro in developing MPT putting turf.  StarPro agreed to utilize its expertise in marketing the MPT putting turf and assist Challenger Turf in creating the MPT putting turf.  Challenger Turf with StarPro consulting created the MPT putting turf. TenCate North America provided warehousing, cutting and shipping services. These three entities met at a meeting and agreed upon this arrangement with anticipated revenue devised by the selling of MPT putting turf by StarPro to the do-it-yourself installer market.  Revenue was shared by the entities when a sell to the respective do-it-yourself installer remitted payment to StarPro for the MPT manufactured by Challenger Turf and the warehousing and shipping of the product was conducted by TenCate North America.

In a partnership, each partner has a legal duty to act in the partnership's best interests, as well as the best interest of the other partners. Partners in a partnership must be able to trust and rely on their fellow partners for promoting the success and best interests of the business. Their relationship is built on good faith, honesty, loyalty, and fairness.  They are held to high standards of care, and their duties include acting for the common benefit of all partners in business matters and refraining from taking advantage of other partners.

Defendants Challenger Turf and TenCate North America breached their duties of Good Faith, Loyalty and Fair Dealings owed to StarPro when

10

Defendants ceased providing MPT to StarPro in 2022 resulting in StarPro being forced out of business. Defendants Challenger Turf and TenCate North America knew that ceasing to provide MPT to StarPro in 2022 would result in StarPro being forced out of business. (SAC ¶¶ 190-192).

**4.    Polyloom Corporation of America and Challenger Turf, Inc. breached their warranty in the sale of Putting Turf to StarPro in 2023.**

In 2023, StarPro subsequently placed an initiating PO to direct the manufacturing of a run. StarPro subsequently paid full value for the MPT up front prior to the manufacturing of the MPT product. StarPro specifically informed Challenger Turf that that putting turf would need to provide characteristics wherein the resulting putting turf would function with a stimp value between 9.5 and 11. Challenger Turf acknowledged that the putting turf would function with a stimp value between 9.5 and 11. Challenger presented a putting turf which initially had a stimp value between 9.5 to 11. (SAC ¶¶ 95-100).

Soon after receiving the putting turf and filling all backorders, complaints came in regarding the loss of integrity of the product. The nylon fibers were inferior and "relaxed/straightened" thus destroying the integrity of the product because the stimp value slowed to approximately 6 on the stimp meter. Seven on the stimp meter is unacceptable to golfers because the ball rolls too slowly for realistic putting. Based on the poor performance of the product, customers

11

called StarPro, complaining and irate at being sold bad turf and requesting their money back, which StarPro did. It is estimated that approximately 70% of all products sold from this fraudulently substituted and defective product was rejected or returned. Challenger Turf knew specifically that the putting mat was required to perform with a stimp value between 9.5 and 11.  Such knowledge imparts an implied warranty of fitness for Particular Purpose on Challenger Turf for the putting turf sold to StarPro.  Challenger Turf has additional warranties which include among other things that the putting turf will function as a putting turf.  (SAC ¶¶ 102-106).

StarPro met with Challenger Turf to discuss the unacceptable substitution of product and requested reimbursement for the bad turf.  StarPro met with Challenger Turf and TenCate to discuss the unacceptable substitution of product and requested reimbursement for the bad putting turf.  At this meeting, Mr. Matt Riggs, vp of sale of TenCate admitted that the putting turf sold to StarPro was unacceptable and did not function as a putting mat.  To date, Challenger Turf has refused to refund any monies for the breach of warranties for the putting turf sold to StarPro. (SAC ¶¶  107-110).

**5.  Polyloom Corporation of America and Challenger Turf, Inc. violated the US Antitrust laws by refusing to deal with StarPro after having acquired a monopoly in MPT manufacturing.**

As previously discussed with respect to the Partnership between Polyloom Corporation of America, Challenger Turf Inc. and StarPro, the Appellees

12

approached StarPro on their own behalf and enticed StarPro to assist in their development of a new putting turf which had unique characteristics by providing the same stimp value in any direction of putt. This unique feature does not exist with regular putting turf and is considered inferior.

A representative of Challenger Turf, Mr. David Calhoun, having specific knowledge of this unique market which Challenger Turf was not in, was aware of this new opportunity. With the knowledge of this new and unique market opportunity, and knowing that StarPro's reputation for this specific market enabled Appellants to enter into this specific market, Appellees on their own accord and initiative approached StarPro knowing that no manufacturer of MPT existed in order to enter into an agreement to combine resources.

Appellees knew that StarPro only sold MPT putting turf, no other alternative, and that by agreeing to manufacture the MPT, a monopoly would be created. After a period of time, Appellants refused to provide MPT to StarPro. They did this knowing that StarPro was successfully selling MPT. The result is that StarPro as a competitor was eliminated. Ultimately consumers suffered because the price which Appellees charged consumers was significantly higher than those previously charged by StarPro. (SAC ¶¶ 144-147).

### 5A.  Product Market

The relevant product market  for this refusal to deal antitrust claim is artificial putting surfaces constructed from nylon synthetic artificial turf fibers tufted into a backing in a cross- over stitched manner to produce a putting surface having a stimp value of between 9.5 to 11 as measured using standard practices for the do-it-yourself installer.  The artificial surface includes an embossed rubber backing. (SAC ¶ 124.)

The cross-over stitched nature of the nylon synthetic artificial turf fibers provides the putting surface with very little grain in any/all directions.  This arrangement enables an individual putting on this surface to experience equal stimp values on the putting surface regardless of the direction of putting into a putting cup.(SAC ¶ 125).

In fact this is specifically the product which Appellees have a monopoly in and refuse to deal with StarPro after having voluntarily engaged in a Partnership wherein the MPT was provided to StarPro.  In other words, in a refusal to deal scenario within the Antitrust Regime, this is the actual product which the monopolist is refusing to deal.

This relevant market does not include general putting turf made by synthetic yarns. Cheaply made and poorly performing putting turf is not in the same market as the more sophisticated cross-over stitched constructed putting turf.  The cross-over stitch process is more elaborate than that used

in the other poor performing putting turf and produces a unique result.  The cross-over stitch process produces a unique product which maintains consistent stimp value along all directions. A distinct class of customer purchased the cross-stitched putting surface as it required higher pricing, which the distinct class of customer was willing to pay for the unique performance.  (SAC ¶¶ 128-131).

## 5B.  Geographic  Market

The relevant geographic market for this refusal to deal antitrust scenario is the Continental United States.  Due to the shipping costs of large bulky items shipping outside the United States is not feasible.  StarPro is a leader in the MPT cross-stitched market and only has customers which receive the MPT cross-stitched product shipped domestically by StarPro.  While other consumers are plausible, it is the experience of StarPro that only the Continental United States is an appropriate geographic market.  (SAC ¶ 122). Indeed this is the relevant market which was serviced by the Partnership and monopolist and hence is the subject market for the "refusal to deal" scenario.

## B.  Procedural History

### 1. The District Court's Order to Dismiss all Pending Claims

On March 1, 2024, StarPro filed the underlying lawsuit, claiming Antitrust laws were violated, that partnership laws were violated, and that Appellees had breached

an implied warranty and other warranties regarding the sale of certain products to Appellant.  Originally Claims 1- 11 were presented.  This Appeal only involves Originally filed Claims 1, 2, 5 and 9.

## II.  SUMMARY OF THE ARGUMENT

In granting Defendants'/Appellees motion to dismiss StarPro's Amended Complaint the District Court made a series of legal errors:

1.      With respect to Claim 9, the breach of implied warranty, The District Court in its order opines "…and when a buyer's acceptance of the goods is made with full knowledge of the nonconformity, the buyer is precluded from rejecting his acceptance of the goods… Lastly, where a tender of nonconforming goods has been accepted, "[t]he buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from remedy. Order P. 15 These statements misinterpret the facts presented in the Complaint which specifically assert that the failure of the product to perform at the required stimp value was not known at the time of acceptance.  The Appellees were timely notified of the breach and the Appellees even admitted that a breach existed.  The Court's rationale for dismissing this claim is not present and does not accept the statements as made by Appellant as being true.

2.  With respect to Claim 5, the breach of partnership obligations, the District in its order opines "Under the UCC, contracts for the sale of goods between merchants are not to be implied through verbal communications; such contracts must be in writing.  . As Plaintiff have failed to allege the existence of any written "partnership"

16

agreement .. Claim 5 ..fail.  This is an erroneous application of UCC requirements to Agency Law.  Partnership agreements in Georgia may be oral and based on the intent of the parties.  The underlying subject matter of which the Partnership is involved in is irrelevant to the Partnership formation.  The Court erred in applying UCC requirements that goods sold by a merchant must be in writing to a Partnership.

3.      With respect to Claims 1 and 2, the District Court erroneously failed to review the Antitrust allegations in view of a "refusal to deal" scenario including the respective product and geographic markets when a monopolist voluntarily deals with a competitor in providing a product then refused to provide the product to the competitor without justification.

### III.   STANDARD OF REVIEW

This Court reviews *de novo* a district court's grant of a motion to dismiss for failure to state a claim pursuant to Federal Rules of Civil Procedure 12(b)(6). *Chaparro. V. Carnival Corp.,* 693 F.3d 1333, 1335 (11th Cir. 2012).

### A.   Standard Applicable to Motions to Dismiss

When considering a motion to dismiss, a district court must "view the allegations of the complaint in the light most favorable to the plaintiff, consider the allegations of the complaint as true, and accept all reasonable inferences therefrom." *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004).

Additionally, with respect to antitrust cases, the 11th Circuit in *Spanish Broadcasting System v. Clear Channel Communications, Inc.* has stated " Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market." 376 F.3d 1065 at 1071 (11th Cir. 2004).

## IV.   ARGUMENT

### A. The District Court Erred in Rejecting Detailed Allegations of a Breach in Partnership duties pursuant to Claim 5.

The District in its order opines "Under the UCC, contracts for the sale of goods between merchants are not to be implied through verbal communications; such contracts must be in writing.  . As Plaintiff have failed to allege the existence of any written "partnership" agreement .. Claim 5 ..fails."  This is an erroneous application of UCC requirements to Agency Law.  Partnership agreements in Georgia may be oral and based on the intent of the parties.  "The relationship of partners arises out of contract, which may be oral, written or implied" *Baker v. Schneider,* 300 Ga. App. 750 at 754 (2009).  The underlying subject matter of which the Partnership is involved in is irrelevant to the Partnership formation.  The Court erred in applying UCC requirements that goods sold by a merchant must be in writing to a Partnership. Appellant acknowledges that an underlying sales contract involving goods with third parties must comply with the UCC Statue of Frauds, but the internal partnership arrangement does not.

## B. The District Court Erred in Rejecting Well-Pleaded Allegations Supporting Appellants Breach of Contract Claim.

With respect to Claim 9, the breach of implied warranty, The District Court in its order opines "…and when a buyer's acceptance of the goods is made with full knowledge of the nonconformity, the buyer is precluded from rejecting his acceptance of the goods… Lastly, where a tender of nonconforming goods has been accepted, "[t]he buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from remedy.  Order P. 15 These statements misinterpret the facts presented in the Complaint which specifically assert that the failure of the product to perform at the required stimp value was not known at the time of acceptance.  The Appellees were timely notified of the breach and the Appellees even admitted that a breach existed. The Court's rationale for dismissing this claim is not present and does not accept the statements as made by Appellant as being true.

As provided in the Statement of facts - Challenger Turf acknowledged that the putting turf would function with a stimp value between 9.5 and 11. Challenger presented a putting turf which initially had a stimp value between 9.5 to 11. (SAC ¶¶ 95-100).

Soon after receiving the putting turf and filling all backorders, complaints came in regarding the loss of integrity of the product. The nylon fibers were

19

inferior and "relaxed/straightened" thus destroying the integrity of the product because the stimp value slowed to approximately 6 on the stimp meter. Seven on the stimp meter is unacceptable to golfers because the ball rolls too slowly for realistic putting.  Based on the poor performance of the product, customers called StarPro, complaining and irate at being sold bad turf and requesting their money back, which StarPro did. It is estimated that approximately 70% of all products sold from this fraudulently substituted and defective product was rejected or returned. Challenger Turf knew specifically that the putting mat was required to perform with a stimp value between 9.5 and 11.  Such knowledge imparts an implied warranty of fitness for Particular Purpose on Challenger Turf for the putting turf sold to StarPro.  Challenger Turf has additional warranties which include among other things that the putting turf will function as a putting turf.  (SAC ¶¶ 102-106).

StarPro met with Challenger Turf to discuss the unacceptable substitution of product and requested reimbursement for the bad turf.  StarPro met with Challenger Turf and TenCate to discuss the unacceptable substitution of product and requested reimbursement for the bad putting turf.  At this meeting, Mr. Matt Riggs, vp of sale of TenCate admitted that the putting turf sold to StarPro was unacceptable and did not function as a putting mat.

The Complaint clearly details the appropriate cause of action for Claim 9 and even includes an admission from Appellant that a breach existed.  Clearly this claim survives a motion to dismiss.

20

**C.** **The District Court Erred in Rejecting Appellant's Well-Pleaded Allegations Supporting Appellants Antitrust violation claims 1 and 2 with Respect to Refusal to Deal Scenario.**

The seminal case regarding refusal to deal antitrust situations is *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.* 472 U.S. 585 (1985).  In *Aspen*,  Aspen Skiing Company owned three of four ski mountains in Aspen, Colorado.  Aspen Highlands owned the fourth. They combined resources to offer a product.  Aspen Skiing unilaterally terminated this effort and refused to sell lift tickets to Aspen Highlands on any reasonable terms, even when Highlands offered to buy tickets at full retail price.  The court ruled that Aspen Skiing's refusal to continue dealing with Highlands constituted unlawful monopolization under Section 2 of the Sherman Act because Aspen Skiing's conduct was exclusionary and not motivated by efficiency but by a desire to harm competition and maintain monopoly power.

In summary, *Aspen* holds that when prior voluntary and profitable course of dealings exist with a monopolist and a competitor, that if a unilateral termination of the profitable course of dealings by the monopolist refusing to deal with the competitor is present.  The monopolist is in violation of the Antitrust laws if the intent of the refusing to deal is for anticompetitive purposes such as eliminating competition and consumers are ultimately injured due to the lack of competition.

These are the exact facts present in Claims 1 and 2 of the Complaint. Appellees voluntarily approached and engaged Appellant to enter into a joint

arrangement wherein Appellees would contribute a product which was the only source available to Appellant and Appellant would contribute services and expertise in the development of the product and its respective market. Appellees knew fairly well that in establishing such a relationship that Appellant would become reliant on Appellee to provide the MPT putting turf. Even when Appellees increased the price of the MPT, Appellant purchased the MPT increasing the profits of Appellees. However, to completely eliminate competition, Appellees refused to provide the MPT to Appellant once Appellant became reliant on them as a source. The monopoly in MPT was had by Appellee and Appellant had only sold MPT, no other substitute was suitable. The intent of Appellee in refusing to sell to Appellant was to force Appellant out of business and remove a competitor. The result is Appellant was forced out of business and Appellee was able to sell the MPT at a higher price to consumers. Consumers were injured with the removal of the competitor.

*Aspen* states that the offense of monopolization under §2 of the Sherman Act requires two elements 1) the possession of monopoly power in a relevant market and (2) the willful acquisition, maintenance or use of that power by anticompetitive or exclusionary means. *Aspen* at 595. *Aspen* also states "If a firm has been attempting to exclude rivals on some bases other than efficiency, it is fair to characterize its behavior as predatory. *Aspen* at 605. Furthermore, when a plaintiff alleges a claim for attempted monopolization under §2, they must

22

plausibly assert three things "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probably of achieving monopoly power. " *Spectrum Sports, Inc. v.. McQuillan* 506 U.S. 447 (1993).   Both of these actions are well pled in the complaint.  The District Court erred in not considering Appellant's Claims 1 and 2 in view of a Refusal to Deal Scenario even though such scenario was mentioned in the Complaint and during Oral Arguments.  The District Court in its order fails to mention any reference to a Refusal to Deal Scenario which *Aspen* clearly supports.

In addition to presenting the antitrust violations, Appellant is required to identify a relevant product and geographic market.  The District Court ruled as a matter of law that Appellants proposed product and geographic market failed. Appellant respectfully submits that under a "refusal to deal" antitrust scenario as presented by *Aspen*, Appellant has clearly established the relevant product and geographic market by identifying the specific product which is the center of the monopoly and which Appellees refuse to provide to Appellant after it had already clearly done so.

In essence, is it plausible that the product which is subject of a monopoly and which a monopolist originally voluntarily provided to a competitor and subsequently pulled the rug out from under the competitor once they became

23

reliant on the respective product and refuse to deal the product to the competitor be the "product market" in dispute.  Of course it is.  *Aspen* presents the exact scenario.

An additional relevant case is *Eastern Dental Corp v. Isaac Masel Co., Inc.* 502 F.Supp. 1354 (EDPA 1980).   In this case, Isaac Masel  had provided a product at wholesale price to the Plaintiff but subsequently refused to do so.  The Court ruled that the offering of the product at wholesale price could be the relevant market.  Namely, that which was originally provided and subsequently removed was the item defining the market.  The *Eastern Dental Corp* court stated:

" The Supreme Court, however, has indicated that within the relevant product market, well defined submarkets may exist. *Brown Shoe Co. v. United States,* 370 U.S. 294, 325, 82 S. Ct. 1502, 1523, 8 L. Ed. 2d 510 (1962). *See Columbia Metal Culvert Company v. Kaiser Aluminum and Chemical Corp., supra,* at 26-27. "The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe Co. v. United States, supra,* at 325, 82 S. Ct. at 1523.

24

A method of product distribution can be considered a relevant submarket for antitrust purposes. *See, e. g., Greyhound Computer Corporation, Inc. v. International Business Machines Corporation,* 559 F.2d 488, 494 (9th Cir. 1977). In *Greyhound,* the court held that because the computer industry recognized that there was a distinction between selling and leasing, there was sufficient evidence from which the jury could infer the existence of a submarket consisting  of the *leasing* of general purpose digital computers.

In the instance, plaintiff contends that, although the record indicates that disposable orthodontic products manufacturers marketed other products through sales to wholesale distributors, Masel was the only manufacturer which marketed facebows in this manner. Indeed, no manufacturer would sell facebows to EDC after the cutoff although they would sell it other products. There is testimony in the record that sales of facebows at wholesale prices created merchandising problems which were not present in direct retail sales. From the above, a factfinder could infer that the industry recognized a wholesale facebow submarket. Thus, a genuine issue of fact exists as to whether such a market exists and whether Masel had monopoly power in that market."

The *Eastern Dental Corp* court rules that a genuine issue of fact exists as to the definition of the product market.  This respect for the Plaintiff's rights to conduct discovery and uncover facts necessary to its case and avoid a motion for

dismissal pre-discovery follows this own courts jurisprudence in *Spanish Broadcasting System v. Clear Channel Communications, Inc.* which this court has stated " Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market." 376 F.3d 1065 at 1071 (11th Cir. 2004).

Finally, the reality that a special market exists as defined by the MPT product is evidenced by the specific actions of Appellees. Appellees make synthetic turf and putting mats. However, to their expertise a further market existed – that for the MPT product. The appreciation that such a specific market exists is evidenced by the Appellees' initiation of efforts to entice Appellant and their good will in the industry, namely MPT market, to join forces and create a partnership between them which focuses on the selling of MPT turf. The personal knowledge of David Calhoun of this specialty market existence is evidenced by the Appellees' willingness to engage in the development of MPT at their own facilities even though such development would not be easy and would be time consuming. One must ask, if Appellees felt a special market did not exist, why would they go to such trouble and expense just to add a new sku to their line. It's because this sku is special.

Appellee's own actions coupled with the specific exclusion of the MPT product presents a plausible argument that the MPT is the correct product market for this

26

refusal to deal allegations.  Once again, the simple question of "what are Appellees refusing to deal in" seems to point to the answer which is the relevant market.

With regards to the Geographic market.  The United States is the location of the customer base for the MPT sold by the Partnership and is rightfully identified as the correct Geographic market.  At the least, presumably.

The District Court erred in dismissing Claims 1 and 2.

## V.  CONCLUSION

For the foregoing reasons, StarPro respectfully requests that the Court reverse the District Court's dismissal of the Claims 1, 2, 5 and 9 of the SAC.

Boss Law Group, LLC

Respectfully submitted,

Dated: July 9, 2025                    By: /s/ Gerald R. Boss
                                       _____

                                       Attorney for Plaintiff - Appellant

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains **6,367 words**, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type of style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface, **14-pt Times New Roman**, using Microsoft Word text editor.

Dated: July 9, 2025                                    By: /s/ Gerald R Boss

28

## Certificate of Service

I hereby certify that I electronically filed the foregoing **APPELLANT'S BRIEF** with the Clerk of the Court by using the Appellate CM/ECF system on **July 9, 2025**. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Respectfully submitted,

Boss Law Group, LLC

Dated: July 9, 2025

By: /s/ Gerald R Boss

Attorney for Plaintiff - Appellant
StarPro/, Greens, Inc.

29